## STATE OF HAWAII *v.* GREGORY DALE HOGUE.

### No. 4987.

JUNE 15, 1971.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE LANHAM IN PLACE OF KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY MARUMOTO, J.

Defendant was convicted after a jury trial in the circuit court of knowingly possessing marihuana in violation of HRS § 329-5. The portion of the statute relevant to this case reads as follows:

"§ 329-5. Additional acts prohibited; penalty. No person shall knowingly plant, cultivate, produce, manufacture, possess, have under his control, prescribe, administer, or compound any narcotic drug as defined by section 329-1 except as provided in this chapter. Any person found guilty of any of the foregoing acts shall be imprisoned at hard labor not more than five years

for the first offense and imprisoned at hard labor not more than ten years for any subsequent offense; provided that, every person who possesses any marijuana, except as otherwise provided by law, shall be punished by imprisonment for not more than one year, or for not less than one year nor more than five years."

The proviso in the statute was added by S.L.H. 1969, c. 161. It grants to the circuit court discretionary power to treat possession of marihuana either as a felony or as a misdemeanor. This was defendant's first conviction for the offense. So, the court treated the violation as a misdemeanor, placed the defendant under probation for one year and imposed upon him a fine of $100.

The case was submitted to the jury upon the following stipulation of facts:

"That the State is able to prove by the testimony of the three arresting officers, upon the trial of Gregory Dale Hogue, that the defendant Gregory Dale Hogue on or about the 5th day of March, 1970, in the County of Kauai, State of Hawaii, did then and there at the invitation of a friend, one Charles Glagolich, who was the owner of a pipe containing marihuana in hashish form while sitted at a picnic table at Lydgate Park with Mr. Glagolich and three other friends, Stephanie Kay Stearns, Johnny Ray Griffith and Georgia Marie Shannon, did knowingly take two puffs from a pipe containing marihuana in hashish form.

"That the three officers will testify that, prior to the arrest, they observed Charles Glagolich turn over a pipe containing marihuana in hashish form to one Stephanie Kay Stearns, who after a couple of puffs turned it over to one Johnny Ray Griffith, who after a couple of puffs turned it over to defendant Gregory Dale Hogue. That defendant Gregory Dale Hogue was observed by the three arresting officers with a hashish

pipe in his hands, no one else was holding it, and did take two puffs from said pipe knowing it to contain marihuana in hashish form. That after the pipe had been passed and the actions were observed by the three arresting officers, defendant together with his friends were placed under arrest for unlawful possession or control of marihuana. Defendants were properly advised of their constitutional rights.

"That the State's contention is that the offense committed by defendant Gregory Dale Hogue is the knowingly taking of two puffs from a pipe containing marihuana in hashish form owned by one Charles Glagolich. Defendant, if called, will testify that he took only one puff from said pipe.

"That the residue within the pipe was analyzed by Dr. Quentin Belles. Said analysis revealed an oily residue which a chemical test showed was charred marihuana."

The defense counsel entered into the stipulation with the full understanding of the defendant. The record shows the following colloquy between the court and the defendant:

"THE COURT: Mr. Hogue, do you agree with the stipulation of facts?

"DEFENDANT: Yes, your honor, I do."

Among the instructions given by the circuit court to the jury were the following:

"If counsel for the parties have stipulated to any fact, you are to regard that fact as being conclusively proved.

\*     \*     \*     \*

"Hawaii statutes do not state that smoking marihuana, per se, is legal or illegal. It does state that possession or control of marihuana, in its various forms, is illegal.

"Considering the totality of the circumstances, a person may smoke marihuana *without* 'possessing' or 'controlling' it, or he may smoke marihuana in such a way that he *does* have possession or control over it.

"To 'possess' means to have the actual control, care and management of the marihuana (hashish), and not a passing control fleeting and shadowy in its nature."

On this appeal, no trial error is alleged. The appeal is based on the denial by the circuit court of two motions to dismiss made before the trial under H.R.Cr.P. Rule 12. The motions were renewed at the close of the case for the prosecution, and again at the close of the case for the defendant, in the form of a motion for judgment of acquittal under H.R.Cr.P. Rule 29.

The first motion for dismissal was made on the ground that the mere passing and puffing from a marihuana pipe owned and supplied by another was insufficient as a matter of law to constitute a possession of marihuana proscribed in HRS § 329-5. The stipulation quoted above provided the factual basis for the motion.

The ground for the second motion was that the nature and the quantity of the marihuana residue found in the pipe was so minute as to be insufficient as a matter of law to be capable of the type of possession proscribed by the statute. On this motion the last paragraph of the quoted stipulation was not to be considered. Instead, the motion was submitted upon a factual situation stated in the first three paragraphs of the stipulation, the report of Dr. Quentin Belles to the police department regarding the residue in the pipe from which the defendant took the puff or puffs, and the additional stipulation that Dr. Belles could determine the presence of marihuana in the pipe only by a chemical test and not by any microscopic test.

In presenting the first motion to the circuit court, the defense relied on *Eckroth* v. *State*, 227 So. 2d 313 (Fla. 1969). That was a case in which a Florida district court of appeal held that the taking of a "drag" from a pipe belonging to another person and filled with marihuana, and passing the pipe on among persons seated in a circle, evinced a mere passing control fleeting and shadowy in nature, and did not constitute sufficient possession to support a conviction for unlawful possession of marihuana.

The case was reversed by the Florida supreme court in *State* v. *Eckroth*, 238 So. 2d 75 (Fla. 1970), while this case was on appeal here. The reversal was based upon a reaffirmance of *Reynolds* v. *State*, 92 Fla. 1038, 111 So. 285 (1927), a prohibition era case involving unlawful possession of liquor, which defined possession as "conscious and substantial possession * * *, as distinguished from a mere involuntary or superficial possession", and the application of the definition to the facts in the case. In applying the definition to the case, the court stated: "The possession and control of defendant Eckroth in the instant case meets the *Reynolds* test. In fact, the uncontradicted evidence establishes actual, physical possession and control of the drug."

We agree with the Florida supreme court in its definition of possession and its application of the definition to the facts in that case.

Here, the situation is similar to the situation in *Eckroth*. The stipulation stated that the defendant was observed by three police officers "with a hashish pipe in his hands, no one else was holding it, and did take two puffs from said pipe knowing it to contain marihuana in hashish form", after two other persons sitting at the same table took two puffs each from the same pipe. The facts stipulated, as having been observed by the officers, show conscious and substantial possession, not a mere involuntary

or superficial possession, and much more than a passing control, fleeting and shadowy in nature.

Thus, the circuit court did not err in denying the first motion to dismiss. Nor did it err in its denial of the second motion, as discussed below.

Let us assume arguendo that the statute merely proscribes possession of a usable quantity of narcotic drug. On that assumption, the circuit court could have granted the second motion only upon ruling that the defendant did not possess a usable quantity of marihuana as a matter of law. Under the stipulation applicable to the motion, the court would not have been warranted in making such a ruling. The stipulation stated that the defendant took one puff from the pipe, by his own admission, and, if the police officers were to be believed, he took two puffs, knowing that the pipe contained marihuana in hashish form. The most that can be said in favor of the defendant, is that the stipulation posed a jury question. *People* v. *Leal,* 64 Cal. 2d 504, 50 Cal. Rptr. 777, 413 P.2d 665 (1966). On the question of usable quantity here, Dr. Belles' test was not material. It was a test of the residue in the pipe after the defendant had smoked, and had no bearing on the quantity of marihuana in the pipe when the defendant held it and smoked from it.

The defense argues that the legislature has not expressly outlawed the smoking of marihuana, that its silence in this regard suggests that it was more concerned with curbing the dealer and supplier than with the user at the end of the supply chain, and that in an area where the legislature has remained silent it appears to be a proper judicial function "to dilute the number of marihuana defendants down to only the owner-user while freeing the non-owner user."

The answer to the argument is that the question before us is in an area where the legislature has spoken, not

where it has remained silent. In an area where the legislature has spoken, our function is to give effect to the legislative will.

The acts proscribed in HRS § 329-5 are basically those which are prohibited in § 2 of the Uniform Narcotic Drug Act. Contention has frequently been advanced that the word "possess," as used in § 2 of the uniform act, does not refer to possession of a narcotic drug for the personal use of the possessor. Courts have rejected such contention. *State* v. *Martin,* 193 La. 1036, 192 So. 694 (1939); *Gonzales* v. *People,* 128 Colo. 522, 264 P.2d 508 (1953); *State* v. *Reed,* 34 N.J. 554, 170 A.2d 419 (1961); *State* v. *DaVila,* 150 Conn. 1, 183 A.2d 852 (1962). It is stated in *State* v. *Reed* as follows, as one of the reasons for rejection:

"* * * [S]ection 4 of the Drug Act provides that 'it shall be unlawful for any person to * * * possess * * * any narcotic drug, *except as authorized by this chapter.*' * * * There follows a number of sections which permit possession under certain conditions by physicians, pharmacists, and others who must handle narcotics in the regular course of business. * * * Section 36 expressly permits possession for the possessor's personal consumption or use if he has obtained the drug from an authorized dispenser for medical treatment and if he keeps the unused drug in the container in which he received it. * * * This exception shows that the Legislature considered the problem of possession by a user. And the provision in section 4 that possession is unlawful except as authorized elsewhere in the statute, together with section 36, shows that the Legislature intended possession for personal consumption unrelated to medical treatment to be a violation of the act."

We agree with the foregoing reasoning. Sections 4 and 36 of the New Jersey act, referred to in the quoted opinion, are §§ 2 and 11 of the uniform act. HRS § 329-15 is basically § 11 of the uniform act. It provides: "A person to whom or for whose use any narcotic drug has been sold or dispensed by an apothecary, physician, dentist, podiatrist, or practitioner, * * * may lawfully possess it in the container delivered to him by the person selling or dispensing the same." From this, it may be clearly inferred that possession of any narcotic drug for personal use otherwise than as prescribed for medical treatment comes within the prohibition of HRS § 329-5.

Furthermore, the concern of the legislature with dealers and suppliers of narcotic drugs is shown specifically in its enactment of S.L.H. 1953, c. 19, § 1(3), now compiled in HRS § 329-3, which reads: "It shall be unlawful for any person to possess *with the intent to sell or to sell or dispense* any narcotic drug * * *, except as provided in this chapter." (Emphasis supplied) The proscription of possession in HRS § 329-3 was originally enacted in S.L.H. 1931, c. 152, § 3. The legislature would have had no reason to enact S.L.H. 1953, c. 19, § 1(3), if S.L.H. 1931, c. 152, § 3, were directed solely against dealers and suppliers.

Also, it may be concluded from the enactment of S.L.H. 1969, c. 161, that the legislature understood the proscription in HRS § 329-5 to encompass possession of any narcotic drug, including marihuana, for personal use. That act amended HRS § 329-5 by adding the proviso which gave the circuit court discretionary power to treat possession of marihuana, as distinguished from other narcotic drugs, either as a misdemeanor or a felony. Possession of marihuana by a dealer or a supplier comes within the proscription of HRS § 329-5, but, if intent to sell can be

proved, it is basically a violation of HRS § 329-3, which is a felony.

Affirmed.

*John S. Edmunds,* Chief Deputy Public Defender (*Brook Hart,* Public Defender, with him on the briefs) for appellant.

*Gerald S. Matsunaga,* Deputy County Attorney, County of Kauai (*Kei Hirano,* County Attorney, with him on the brief) for appellee.

---

DISSENTING OPINION OF LEVINSON, J.

I dissent.

I would reverse the appellant's conviction on the ground that a person who receives from another a pipe containing marihuana for the sole purpose of inhaling therefrom and subsequently returning it does not, as a matter of law, unlawfully "possess" or "have under his control" a narcotic drug, within the meaning of HRS § 329-5 (Supp. 1970). That statute provides in relevant part:

No person shall knowingly plant, cultivate, produce, manufacture, possess, have under his control, prescribe, administer, or compound any narcotic drug as defined by section 329-1 except as provided in this chapter.

The Narcotics Act, HRS ch. 329, of which the above provision is a part, does not define the words "possess" or "control." It falls upon this court, therefore, to give these words a sensible and reasonable meaning within the context of the Act. To do so it is first necessary, I believe, to determine the regulatory purposes of the Narcotics Act. Specifically, does the Act disclose any discernible pattern of legislative concern which would throw light on whether the appellant's brief dominion over the pipe containing

marihuana amounted to possession or control as proscribed by HRS § 329-5 (Supp. 1970)? My analysis of the Narcotics Act and the case law relevant to illegal possession leads me to conclude that the possession and control contemplated by the legislature is of a more substantial character than the momentary possession necessary to take one or two puffs.

## 1. HRS CH. 329 INDICATES THAT THE LEGISLATURE DID NOT INTEND TO PENALIZE THE MERE SMOKING OF MARIHUANA.

### A. *The Legislature Sought to Penalize the Possession Necessary for Distribution to Others, Not that Concomitant with Use.*

The provisions of HRS ch. 329 exhibit a clear legislative intent to regulate the sale and distribution of narcotic drugs by comprehensively controlling the chain of supply of such drugs within the State of Hawaii. Persons desiring to produce or manufacture narcotic drugs must first obtain a license issued by the state department of health.[1] Authorized distributors may sell narcotics only to certain designated persons and then only upon written orders.[2] The selling or dispensing of narcotics to minors is prohibited and violations are severely penalized.[3] The State has also regulated the professional use of these drugs[4] and requires that records be filed with a designated public officer when narcotics are dispensed through prescriptions.[5]

It is thus apparent that the broad sweep and scope of HRS ch. 329 is aimed at controlling narcotics by regu-

---

[1] HRS § 329-6.
[2] HRS § 329-7.
[3] HRS § 329-4.
[4] HRS §§ 329-11, 329-13, 329-22.
[5] HRS § 329-8.

lating the manufacturing and distribution sources of the drugs. Nowhere does the Act direct itself to outlawing the mere use of narcotics. HRS § 329-5 (Supp. 1970) does speak of possession and control, but these words must be interpreted in the context of an act clearly designed to control the traffic in drugs by regulating the chain of supply. In this context, I do not believe that the possession or control contemplated by the legislature was meant to encompass the mere taking in hand of a pipe or cigarette for the immediate purpose of smoking marihuana. Instead I think that the possession and control prohibited by the statute is the *power to distribute* the drugs as the possessor sees fit. In the instant case this status belonged to the owner of the marihuana who offered it to the appellant for the latter's immediate consumption. At all times control over distribution remained in the offeror. He is the one, not the mere user, who falls within the prohibition of the Act.

The majority does not agree with this analysis of HRS § 329-5 (Supp. 1970). It does concede, however, that mere "superficial possession" and "passing control" are exempt from the operation of the statute. Nevertheless it holds that the present conduct is not "superficial" or "passing." I am at a loss to conceive what these phrases import if they do not describe the appellant's acts in the present case. What possession could be more superficial, or what control more passing, than the fleeting act of holding and puffing on a marihuana pipe and "passing" it to another? A sensible construction of HRS § 329-5 (Supp. 1970), consistent with the statutory scheme of regulating the marketing and distribution of narcotic drugs, requires that possession be equated with ownership, and control be defined as such management or dominion over the prohibited substance as gives to the controller the power to dispose of it to others. Such an interpretation sweeps

broad enough to encompass those in a position to dispense the prohibited drugs, while passing over persons whose only contact is immediate consumption. In addition, this construction of the Narcotics Act is supported by the case law dealing with fact situations closely analogous to the instant case.

During the "Great Experiment" of the Prohibition era numerous cases arose where a group of persons would be arrested for passing and drinking from a bottle of illegal liquor owned and distributed by one member of the group. The defendants in such cases were charged with unlawful possession of liquor, under statutes worded similarly to our own. The courts were called upon to construe the meaning of possession within the context of a statute aimed at controlling the traffic in intoxicating liquor. Adopting a statutory analysis which parallels the one asserted above, these courts concluded that possession did not include the mere taking in hand for drinking purposes. What was prohibited was ownership or control of such a degree as to give the controller the power of distribution to others. *State* v. *Williams,* 117 Or. 238, 240-42, 243 P. 563-64 (1926); *Brooks* v. *Commonwealth,* 206 Ky. 720, 723, 268 S.W. 339, 340 (1925); *Brazeale* v. *State,* 133 Miss. 171, 173, 97 So. 525, 526 (1923); *State* v. *Munson,* 111 Kan. 318, 319-20, 206 P. 749 (1922); *State* v. *Jones,* 114 Wash. 144, 147-48, 194 P. 585, 587 (1921).

In *State* v. *Williams, supra,* the defendant was charged with the unlawful possession of intoxicating liquor under a statute making it unlawful for any person to "receive, import, possess, transport, deliver, manufacture, sell, give away or barter any intoxicating liquor within this state." The Supreme Court of Oregon asked: "Does the mere taking of a drink of intoxicating liquor, at the invitation of a friend, constitute unlawful possession within the meaning of the statute?" *State* v. *Williams, supra.* The

court answered that such conduct was not within the intent of the statute. In reaching this conclusion the court relied upon the reasoning of an earlier case, *State v. Jones*, 114 Wash. 144, 148, 194 P. 585, 587 (1921), in which the Washington Supreme Court held that:

> [P]ossession, as the word is used in the statute, means something more than the mere taking in the hand for the purpose of immediately drinking the thing thus possessed upon the express invitation of the owner so to do ... the court should at least have defined possession as including control of the thing possessed with the right to dispose of it in any manner the possessor saw fit. As we understand the laws of hospitality, when one is offered a glass of liquor, he has a right to accept and drink it, or refuse it, and his possession, if he accepts it, is not broader than the invitation upon which he acts.

Similarly, one who is offered a pipe of marihuana for immediate consumption obtains only the dominion necessary for that act. Actual possession and control lies at all times in the offeror. It is he, as the distributor of the prohibited substance, who falls within the regulatory purposes of the Act.

B. *The Legislature was Familiar with the Language Necessary to Prohibit the Use of Narcotic Drugs but Chose Not to Adopt It.*

In effect, the majority opinion's definition of possession extends the coverage of the Narcotics Act to penalize the smoking or use of marihuana. This result is, I believe, clearly beyond that contemplated by the legislature when HRS ch. 329 was enacted. This belief is supported by the Narcotics Act itself because the provisions of the Act indicate that at the time the legislature acted it was fa-

miliar with the specific limiting language necessary to deal with the consumption of marihuana. Yet it chose not to employ this language to prohibit the use of narcotic drugs.

HRS § 329-4 of the Narcotics Act prohibits the sale of narcotic drugs to minors. This provision also makes it a crime to induce "any person under the age of twenty years to buy, traffic in, receive, *take, inject, inhale, or smoke* any narcotic drug...." (emphasis added). This is the language the legislature would have used had it desired to prohibit the acts of the appellant. The legislature chose, however, not to proscribe the "taking," "inhaling," "injecting," or "smoking" of marihuana because it was not concerned with penalizing the user of drugs.[6] Therefore, if the legislature did not intend to prohibit the use of marihuana directly, this court should not indirectly do so by broadly defining possession so as to include the superficial custody required for the immediate inhalation of marihuana.

C. *The Majority's Analysis of HRS ch. 329 Does Not Establish that the Legislature Intended the Word Possession to Include the Acts of the Appellant.*

In deciding this case it is important to recognize what is not in issue. The appellant does not contend that possession as used in HRS § 329-5 (Supp. 1970) is limited only to dealers and suppliers of narcotic drugs. Nor is it argued that a person falls outside the statute if he possesses narcotic drugs for his personal consumption. The motive for possession as the word is used in this section is irrelevant. What is important is the power to dispense narcotic drugs to others. This is what is meant by unlaw-

---

[6] HRS ch. 328E (Supp. 1970) which prohibits the use of certain "Intoxicating Compounds" indicates that when the legislature wishes to prohibit the use of a substance it does so in unambiguous terms.

674

ful possession. Thus one who buys a single marihuana cigarette, even for his own immediate consumption, violates the statute because he has acquired the power to dispense, not necessarily by sale, to others. Similarly one who lacks this power does not have unlawful possession, even though he takes a puff on a marihuana pipe. What this case puts in issue is not whether possession for personal use violates the statute but whether personal use without possession has been made a crime.

The majority opinion attempts to answer this question by arguing that all contact with marihuana is prohibited unless specifically authorized by HRS ch. 329.[7] The cases cited in support of this position are based upon different factual situations[8] since they deal only with the question whether ownership for personal use constitutes unlawful possession. Nevertheless, the decision in *State* v. *Reed*, 34 N.J. 554, 559, 170 A.2d 419, 422 (1961), one of the cases cited by my Brother Marumoto, is enlightening for its analysis of the reasons behind defining unlawful possession so as to include possession for personal use.

[T]he inclusion of unauthorized possession for personal consumption within the proscriptions of the Drug Act seems necessary to fulfill the legislative goal of suppressing illegal narcotics traffic. Every possessor of narcotics has the power to dispense them to another.

---

[7] This argument undercuts the majority opinion's earlier position that "superficial possession" is not prohibited by the statute, since nowhere in HRS ch. 329 is such possession specifically authorized.

[8] The defendants in each of the cases cited by the majority were charged with ownership possession of substantial quantities of prohibited drugs. State v. DaVila, 150 Conn. 1, 183 A.2d 852 (1962) (defendant sold 9 bags of heroin to a federal narcotics agent while retaining a tenth bag for his own use) ; Gonzales v. People, 128 Colo. 522, 264 P.2d 508 (1953) (defendant charged with possession of 15 marihuana cigarettes) ; State v. Martin, 193 La. 1036, 192 So. 694 (1939) (defendant charged with possession and control of 3 capsules of heroin) ; State v. Reed, 34 N.J. 554, 170 A.2d 419 (1961) (the defendant found in possession of quantity of marihuana cigarettes allegedly rolled by him at a private party).

That power in the hands of any person is a potential source of illegal traffic.

As we have seen, by holding in his hand and puffing on the marihuana pipe in the presence, at the invitation, and under the control of the owner, the appellant did not acquire this statutorily proscribed power to dispense to another. Therefore, as the New Jersey Supreme Court points out, he does not fall within the class of persons whom the legislature desired to penalize for unlawful possession.

The majority also relies on HRS § 329-15 which provides that:

A person to whom or for whose use any narcotic drug has been sold or dispensed by an apothecary, physician, dentist, podiatrist or practitioner ... may lawfully possess it in the container delivered to him by the person selling or dispensing the same.

It is argued that this provision authorizes the only form of legal possession contemplated by the statute. Once again such a contention avoids the real issue by failing to answer the question as to what the legislature meant when it used the word possession. HRS § 329-15 actually supports the conclusion that possession within the meaning of the Narcotics Act means the proprietary control inherent in ownership. This is because HRS § 329-15, in authorizing "possession" under specified circumstances, speaks in terms of legalizing *ownership*. Thus it is logically inferable that if the legislature meant ownership when authorizing possession then it also meant ownership when it prohibited illegal possession.

Finally, the majority opinion seems to find significance in the enactment of a separate section proscribing the possession of narcotic drugs with the intent to sell or dispense them. HRS § 329-3. I fail to understand the importance of this section because it has never been contended that

HRS § 329-5 (Supp. 1970) was directed solely against dealers and suppliers. Rather it has been stressed that HRS § 329-5 (Supp. 1970) applies to ownership possession. If the State is able to prove possession of great quantities of narcotics then the defendant may be prosecuted for possession with the intent to sell or dispense them to others. These two sections merely reflect a legislative recognition that possession with intent to sell is a more serious crime than simple ownership and therefore should be more severely punished.[9] The existence of these two sections does not help to answer the basic question whether holding and puffing on a marihuana pipe, while in the presence and under the control of the owner, constitutes unlawful possession within the meaning of HRS § 329-5 (Supp. 1970).

## II. THE MAJORITY OPINION'S DEFINITION OF POSSESSION RENDERS HRS § 329-5 (SUPP. 1970) UNCONSTITUTIONALLY VAGUE.

In a recent opinion my Brother Abe, writing for the court, reaffirmed the fundamental principle of due process of law that a penal statute must state with reasonable clarity the acts it proscribes. *State* v. *Shigematsu,* 52 Haw. 604, 606, 483 P.2d 997, 998 (1971); *accord, State* v. *Abellano,* 50 Haw. 384, 385, 441 P.2d 333, 334 (1968). This constitutional guarantee mandates that criminal legisla-

---

[9] Prior to the 1953 amendment of the narcotics legislation no distinction was made between ownership for personal consumption and possession with intent to sell. RLH § 2603 (1945). Both types of possession were subject to the same penalties. RLH § 2621 (1945). The legislature recognized that possession with the intent to sell is a more serious offense and in 1953 gave it separate treatment and greatly increased the penalties for such possession. S.L.H. 1953, c. 19. As the Senate Standing Committee stated, in reporting the proposed amendment, Senate Committee Report No. 131, 1953 Senate Journal 277:

The purpose of the bill is to strengthen and modernize the laws of the Territory of Hawaii relating to narcotic drugs primarily by increasing the criminal penalties for narcotic violations.

tion be explicitly drawn so that persons potentially subject to its sanctions can know with fair assurance how to act in order to avoid liability. As the United States Supreme Court stated in *Connally* v. *General Construction Co.*, 269 U.S. 385, 391 (1926):

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

In the instant case, I believe that the majority opinion's amorphous definition of possession renders HRS § 329-5 (Supp. 1970) so indefinite that "men of common intelligence must necessarily guess at its meaning and differ as to its application," thereby violating the due process guarantees embodied in article I, section 4 of the Hawaii Constitution and the fourteenth amendment to the United States Constitution.

In construing HRS § 329-5 (Supp. 1970) the majority opinion defines possession as "conscious and substantial possession, not a mere involuntary or superficial possession, and much more than a passing control, fleeting and shadowy in nature." This definition violates the constitutional guarantee of due process of law because it fails to mark explicitly the boundaries of prohibited conduct. No standards are provided which would enable a person to determine what is or what is not under various circumstances unlawful possession of a narcotic drug. To illustrate, if the owner of a marihuana pipe holds on to it while another takes a puff from the pipe, is the latter guilty of unlawful possession or is such possession "superficial" and therefore outside the scope of the statute? Similarly, if a person just holds the pipe in his hand and does not puff on it, will he be liable, under the majority's definition of possession, to criminal prosecution? I cannot divine

the answer to these questions from the definition of criminal liability presently adopted by the court, nor do I believe the general public will have greater success. The court's vague definition of unlawful possession not only fails to inform those who are subject to the statute what conduct on their part will leave them liable to its penalties, but also dangerously broadens the discretion of those persons charged with enforcing the statute, thus encouraging arbitrary arrests and convictions.

### III. IT IS UNWISE FOR THIS COURT TO EXTEND THE STATUTE SO AS TO CRIMINALIZE THE USE OF MARIHUANA.

Currently the wisdom of dealing with the problem of marihuana use through the criminal process is being assiduously questioned.[10] There may even exist a serious question as to the constitutionality of marihuana laws.[11] At the very least, scholars who have studied the problem raise grave doubts as to the social utility of criminalizing marihuana use.[12] As Professor John Kaplan of the Stanford University Law School concludes, in his excellent book, MARIJUANA—THE NEW PROHIBITION[13] at 311 (1970), "the

[10] J. Kaplan, MARIJUANA—THE NEW PROHIBITION (1970) ; Rosenthal, *A Plea for Amelioration of the Marihuana Laws*, 47 Tex. L. Rev. 1359 (1969) ; Note, *Possession of Marijuana in San Mateo County: Some Social Costs of Criminalization*, 22 Stan. L. Rev. 101 (1969) ; Note, *Marijuana Laws: A Need for Reform*, 22 Ark. L. Rev. 359 (1968).

[11] M. Town, *"Privacy and the Marijuana Laws,"* reprinted in THE NEW SOCIAL DRUG (1970) ; Wallenstein, *Marijuana Possession as an Aspect of the Right to Privacy*, 5 Crim. L. Bull. 59 (1969), Note *Marijuana and the Law: The Constitutional Challenge to Marijuana Laws in Light of the Social Aspects of Marijuana Use*, 13 Vill. L. Rev. 851 (1968).

[12] See authorities cited in note 10 *supra*.

[13] In reviewing Professor Kaplan's book, Chief Justice George F. Boney of the Supreme Court of Alaska concluded, Review, *Marijuana and the Law*, 6 Harv. Civ. Rights—Civ. Lib. L. Rev. 435, 438 (1971) :

> To a field of law where discussion has hitherto been noticeably colored with emotion and issues frequently treated with clamorous confusion and disarray, Kaplan's work applies a thoroughly documented and orderly framework. This detached and dispassionate analysis of the problems inherent in criminalization of marijuana should set the platform for further discussion.

social and financial costs directly and indirectly attributable to the criminalization of marijuana far outweigh the benefits of this policy." In addition, Professor Kaplan warns in his book, *supra* at 47, "[t]he most serious cost of the criminalization of marijuana is probably that it make felons of a large portion of our population, especially our youth."[14]

This court need not be blind to the practical consequences of its interpretations of law. As the above analysis indicates the purposes of the Narcotics Act will not be undermined if the temptation is resisted to extend the coverage of the Act so as to penalize persons who, perhaps through social pressures, accept an invitation to puff on a marihuana pipe or cigarette. I see little social value in the majority opinion's rigid interpretation of existing drug laws. As Professor Michael P. Rosenthal cogently noted, *A Plea for Amelioration of the Marihuana Laws*, 47 Tex. L. Rev. 1359, 1372 (1969):

> Certainly, the consequences of criminalization would seem to be least warranted in the case of the experimenter. A small transgression or even a small number of transgressions, especially — but not exclusively — when committed by the young and developing, should not be the basis for permanently scarring a person's life. This is part of the rehabilitative ideal. While that ideal is usually spoken of in connection with sentencing after conviction of a crime, it should be given weight in formulating definitions of criminality also.

Based on the above statutory analysis, case law and policy considerations, I would reverse the appellant's conviction.

---

[14] Professor Kaplan reports that recent studies indicate that approximately thirty percent of California's high school students and sixty-nine percent of the students at Stanford University have used marihuana at least once. J. Kaplan, *supra* note 10, at 23. Studies have not yet been conducted in Hawaii. Nevertheless, extrapolating from the available information, I do not believe that in enacting HRS ch. 329 the legislature contemplated that it would be used to label as criminals one-third of today's high school students and two-thirds of today's college students.